Thank you, Your Honor. May it please the Court. I will attempt to reserve five minutes of my time for rebuttal. My name is Gabriel McCarthy. I did come from Boise, although the weather was beautiful yesterday, so it wasn't much of a hardship to be here. I represent Matthew Hutcheson. Mr. Hutcheson, at the time of his sentencing, was 43 years old. He had, in his career that was approximately 20 years, had attained a national reputation in the area of retirement investments. He had testified in front of Congress, and he had submitted, in some form or another, materials to the Supreme Court, and he says that he had appeared on 60 Minutes. And according to witnesses at trial, he did have a national reputation, a very good reputation. He had moved to Boise a little bit before the relevant time period for the charged conduct, and he was in charge of what totaled to just over $5 million worth of investment funds that when it came time for his clients, who had invested with him, to receive their monies back, they were unable to do so. So there is, to date, just over $5 million of clients' money that they would like to have and have not received. The government's theory of the case is that this was kind of a garden-variety theft, that he stole the money for himself. The truth of the matter is that Mr. Hutcheson did not empty these accounts and then leave town under cover of darkness and flee and go to another location in an attempt to avoid being arrested or being detected. He stayed in Boise. He invested in his own home, which is consistent with setting down roots. It's obvious. I mean, it's plain that no one would just not expect for their clients to ever ask for their money back. It couldn't have been his plan to tell them and just not return it and refuse to answer questions forever. So clearly, on the facts of the case, it was Mr. Hutcheson's intent that his clients receive their retirement funds back, and this is a case of when the transfers were made, what was his intent. As the government advanced the trial, did he intend to repay his clients or was his intent to invest the money? What do you do with the, I thought there were precedents saying, that if someone takes funds improperly, that having an intent to repay is not a defense. Candidly, Your Honor, that is true. Intent to repay is not a defense. Didn't the government show also that the funds were taken? They were spent on a very lavish home, on an automobile for his father-in-law, and so forth and so on. The monies were traced from the retirement accounts to another account, and ultimately to those expenditures. Mr. Hutcheson asserts that the monies that were withdrawn were residual plan assets and that the plan asset at the time was no longer the money, but another instrument called a revocable trust receipt or an ITR. Before you get to that, then, I don't want to lead you astray from Judge Gould's question. I think there was evidence that the money was taken improperly is what I'm trying to say. The jury certainly could have found that from this evidence. And Judge Gould's question is, what do you do with the authorities saying that the intent to repay is not a defense? Intent to repay is not a defense. Mr. Hutcheson asserts that it was not intent to repay, that he had actually invested the money. In hindsight, he had invested it imprudently, but that he had actually invested the money. The case comes down to exactly that. Was it? What was his intent? But some of it wasn't invested. Some of it was misused. Yes? If I've got that wrong, please correct me. Mr. Hutcheson asserts that it was invested in the ITRs, the revocable trust receipts. All of it? Some of it went to his home and to cars and whatnot. Yes? I thought you just conceded some of it was traced to those kinds of expenditures. Yes, and that money was no longer a plan asset at the time that it was transferred. The plan asset was the ITRs or the revocable trust receipts. When did the ITRs get in the account to replace the money that was taken? The ITRs were first discussed at trial, and those ITRs were put to paper in 2012. It involved a gentleman named George Gallon. George Gallon testified at the sentencing hearing that the 2012 ITRs were memorialized to a transaction that took place in 2010. According to Mr. Hutcheson, the original ITRs were created in 2010. But didn't that same witness at a grand jury hearing or something recant and say, no, these were just mis-data? When he was under oath and that he... Yes, Your Honor. They weren't transactions in 2010. Yes, Your Honor. George Gallon stated that the ITRs that were attempted to be introduced in, apparently attempted to be introduced in trial, had actually, those pieces of paper had actually been printed in 2012, which was after all of these transfers had occurred. But that they were in, the term backdated is used, although he says that that is an acceptable thing to do with a financial instrument. It just is memorializing when the obligation took effect. And the obligation took effect in 2010 prior to the transfers, when the transfers were made. What evidence is there of that? I'm just a little confused. There was a grand jury that was convened after the trial that dealt with that issue of whether or not this was falsely backdated. I'm a little bit unclear about that. Yes, Your Honor. There was a grand jury proceeding that took place after the trial based on information that was gathered at the end of the trial or after the trial to investigate whether or not the, to investigate the veracity of these documents that were attempted to be introduced into trial. And it was pretty much established that this backdating was not a valid, you know, backdating. It was really a 2012 manufactured document. I think the record is clear that the physical documents were printed in 2012. Mr. Gowen states that they're memorializing a transaction that took place in 2010. And importantly, Mr. Gowen stated that if the ITRs were to be negotiated, that they're worth approximately $6.2 million or more than the loss suffered by the plan participants. Well, in any event, all of this was really before the jury because even though the judge did not allow the documents to be in evidence, the defendant testified extensively about it and tried to explain all of this that you were trying to explain to us today. The jury had all that information before it for its consideration, did it not? Mr. Hutchison did testify and make reference to the ITRs. I would characterize his testimony as testifying that they existed. But at what point didn't the prosecutor sort of throw up his hands and say, Your Honor, let him explain? He's mentioned it so many times, I want him to explain to the jury. I think that's what Judge Block's getting at. We're both trial court judges. I'm a former trial court judge, and it sounded to me like the evidence essentially came in and he was allowed to present this to them. I agree with your characterization. I was not the attorney at trial. Mr. Petrico was. What did he get in front of the jury? I would characterize Mr. Hutchison's testimony as describing that he did something in 2010, but that perhaps at the end of his testimony he thought now the documents would actually make it into evidence, and I don't think that he described particularly the content of the documents, just that he had securitized the planned assets in 2010. Actually, the documents would have shown that they were in 2012. He probably was better off that they were not produced into evidence. The jury had nothing there to really suggest that it was a 2012 document. They would have had the documents to review, and also although I must concede trial counsel did not request and was not denied in its request, apparently Mr. Gallin was available to testify, and his testimony would have been most likely what it was at the sentencing hearing, which is these are worth $6.2 million, and the jury did never get to hear that information. He could have been called as a witness? Mr. Gallin was available as a witness. I don't recall that they – I think that in the conversation where the ITRs are excluded, the realistic prospect of him testifying was abandoned. Counsel, on this issue, is the standard abuse of discretion? It is, yes. All right. Did you want to talk about whether the sentence is substantively unreasonable? Yes. May I interject? I just want to let you know how flattered I am that you made reference to my decision in Paris. Did you have a crystal ball and know that I would be on this panel? I did not, Your Honor, and I made the connection this morning when I saw that you were a member of this panel, and I don't care to be so presumptuous as to tell this panel the import of that information because I think that the panel will be aware on its own, and that is an amazing coincidence. But about the sentence being substantively unreasonable, did you want to address that? I do. Mr. Hutchison was 43 years old. This is a 17-year sentence. He's going to be 60 years old when he gets out. I did provide information that came from Judge Block that was at least one collection of comparisons of fraud cases, loss, and months of sentence. Mr. Hutchison's case would be an outlier compared to that, at least to that one collection of information. And then also I did provide some examples of violent crimes that have lower offense levels than this one. What about the fact that opposing counsel is going to get up and tell me that the national reputation and the 20 years of experience and whatnot, and the reason to think this man was very well credentialed professionally should arguably cut against him because he knew very well what he was doing here. As you said, he had served as an expert witness. Yes. What about that? Mr. Hutchison's intent was never to leave the planned participants without a return. So is your argument that while that is not a defense as a matter of law, per your response to Judge Gould's question, that that intent should go to sentencing, that he didn't understand that these people would lose their retirement funds? Yes, of course. I mean, it's not as if he withdrew $5 million and then disappeared and moved, and that it was an outright theft. At the time the judge sentenced him, was he aware of the subsequent grand jury testimony where the witness then changed his testimony about whether those instruments, whether the funds had actually been securitized? I think that the record is unclear. I would gather that Mr. Hutchison became aware when he heard that testimony being elicited during the sentencing hearing, but I don't know that for sure. Okay. Thank you. Counsel, you've got one minute left. If you wanted to keep some time. May I reserve that minute? We'll give you an extra minute. Thank you. Good morning, Your Honors. Ray Petricchio on behalf of the United States. And I think I will start where Mr. McCarthy started, which was with the ITRs. The court had a few questions about that. First of all, Mr. Gowan and what it is he testified to in the grand jury and in the sentencing hearing about when these ITRs came into existence. The defendant testified at trial that these existed back in 2010 and were proof in 2010 of his intent to protect the plaintiff participants and not to defraud anybody. Mr. Gowan. Forgive me for interrupting. That was his theory. Did he ultimately get to articulate that defense after the prosecutor threw up his hands and said just let him explain? Yes, Your Honor. I was the prosecutor at the trial. You might remember that. I do remember. And he testified to that precisely, Your Honor. And I think it's at SCR 180 and 181, I believe, where he said that this was a plan asset back at the time in 2010 and it replaced the money that he had taken out of the plans and used for his personal purposes. And he also said that by virtue of these ITRs in 2010, it was his intent to protect the plan participants and not to defraud them. So his entire theory of these documents were that they existed in 2010 and became plan assets in 2010. So the jury didn't believe him? I would suggest that they did not. They rejected it. As the court observed, seven or eight times he tried to interject this defense after the evidence had been excluded by the district court judge, and I did. I threw up my hands and said, I don't want the jury to think that I am hiding something from them. So I invited him, with the court's permission, to speak. This is a matter of curiosity. Did the physical documents say 2012 on it, or did it say 2010? I know it wasn't put in evidence. The physical documents said 2010, and that was the documents we received right after we rested our case, even though defense counsel had had them for a couple of days. They were trying to corroborate them. We got these documents and immediately believed that they were fraudulent. But they said 2010. What was the evidence that says that it was 2012? That was developed subsequent to trial, after we convened the grand jury investigation. The grand jury proceeding that established that. Correct. Did the judge know that at the time of sentencing? He did not, but he knew other facts, Your Honor. He knew other facts. I apologize. Did the judge know that at the time of sentencing or at the time of trial? At the time of sentencing. At the time of sentencing, he was aware. We provided the grand jury transcript of Mr. Gowen's testimony to the defendant and the sentencing court, and then Mr. Gowen testified prior, at the sentencing hearing, prior to the judge pronouncing the sentence. And on both of those occasions, both under oath, Mr. Gowen admitted that he was not first contacted, not even contacted until 2012, and that he created those documents in December of 2012. So that was all fraud, basically. Yes, Your Honor. This was after the defendant was already under indictment, after he had been removed as trustee from both of those plans. It was a fraudulent act to create a trial defense, and he was caught red-handed. Yes, he was prosecuted for perjury for lying under oath, you know, when he testified about this being in 2010, but you did not do that. We did not do that, Your Honor. Nobody was prosecuted for perjury? I'm sorry, Your Honor? Nobody was prosecuted for perjury? No, Your Honor. As is in the record, Mr. Gowen initially testified, initially was interviewed by investigators of the Department of Labor, and he said that the documents did exist in 2009 or in 2010, but then with testifying under oath before the grand jury, he ultimately came clean and said they weren't there. At the sentencing, was there an upward uptick for lying under oath? Was that considered by the sentencing judge? Yes, Your Honor. There was a two-point enhancement under the guidelines. And that was the reason why? For committing perjury and attempting to admit these fraudulent documents. The perjury specifically related to the backdating of the document, right? Correct, Your Honor. Yes, and maybe that's a good segue to speak about the sentencing in the case. As I understand defense counsel's argument, there is no challenge to the guideline calculation for which the trial court did add two points for obstruction of justice enhancement. So, the guidelines are not on the table here, nor is, as I understand it, any procedural error. As I understand it, there's no challenge to what the judge did procedurally, just that a 17-year, 210-month low-end guideline sentence is substantively unreasonable for this defendant. But I'd like to . . . You've got a lot of time, counsel. I would agree, Your Honor, that is a lot of time, but let me give you my thoughts as to why that time, in my experience, is completely justified in this case. There are . . . And the judge considered these under 3553. There are so many aggravating factors in this case that there are almost too many to count. The defendant, in committing his crime, exploited his national reputation as an advocate and crusader for transparency in retirement plans. He was looting one of these retirement plans literally simultaneous with his congressional testimony about transparency in retirement plans. He testified before Congress in July of 2010, and the subject matter of his testimony was greater accounting transparency in retirement plans, only days before he had taken hundreds of thousands of dollars out of these plans. How many people . . . Just a factual point. How many individuals had their retirement funds in the plans that he drew upon? Your Honor, it was over 250 individuals. I don't have the precise number off the top of my head, but that was a guideline enhancement for more than 250 victims. Two of them testified at the sentencing hearing, and one of the other aggravating factors I was going to get to is they talked about some of their employees who were part of these retirement plans having to now work well into their 70s and their 80s as a result of having their retirement nest egg completely drained and stolen by this man. He did so against these vulnerable victims, these, in many cases, elderly victims and financially unsophisticated victims, solely for his personal gain, as the court pointed out earlier. However, this money that he took out of the plans went first and foremost into his mansion and estate in Eagle, Idaho. He then used a million more dollars to improve that mansion and estate, to build a horse barn with a loft apartment, to build a horse-riding arena, to put in an in-the-ground pool and hot tub, heated doghouse, secondary garage, and then used it to buy luxury cars, ATVs, and a tractor. If that wasn't bad enough, he then decided he was going to own the Tamarack Ski and Golf Resort for himself and used $3 million from another plan in order to do that. This is one of the most aggravated thefts that I've seen in my career, and it was by a man who cultivated a reputation and was able to prey on his victims because he was someone who was a crusader for transparency. There's no procedural defect here, and the question is whether or not we as an appellate court, I have to put my appellate hat on, can really take issue with the district court's decision on the basis of substantive unreasonableness, that it's too high. Do you know of any case at all where there's an outer limit to substantive unreasonableness? I don't, Your Honor. I could point the court to one case that I believe the defense cited in its brief. It's a Ninth Circuit case. In Mezcua-Vasquez, if I'm pronouncing that correctly, that was a case where I think a 16-level enhancement for an immigration crime, a 16-level enhancement based on an old 25-year-old stale conviction was used to enhance the defendant's sentence under 3553, and that was one where I think this court said it was substantively unreasonable, but it specifically said the scope of our decision is limited to this specific fact. I really love being here because I wrestle all the time with how high is up when I deal with how high should I, and I've done that from time to time. This has nothing to do with Paris, by the way. I'll tell you that right now. Paris is a whole different cup of tea. But it was used as a way of gauging the seriousness of the crime, nothing to do with nationwide disparities and things of that nature. But I just wonder how we go about deciding what number to pick out under this broad discretion that the district court judges have to just have an upward variance that can go 65% higher than the guideline range, 100% higher than the guideline range. Is there any standard out there that we should reflect upon? Yes, Your Honor, and I respect the court's very thoughtful and well-reasoned opinion in Paris, and I would just make the court mindful that there was not a variance in this case. This was a guideline sentence. In fact, it was a low end of the guideline range. And I think, Your Honor, your very thoughtful opinion and survey of securities fraud cases aside, I think some really smart people, judges, defense lawyers, prosecutors, who have sat on the Sentencing Commission and put together their own data and put together their own survey of fraud cases and enhancements, I think that is one guide for judges, and this judge used it as one of his factors. And yes, it wound up being a very high sentence, but not one that I would think is substantively unreasonable given who this man was and what he did and what his victims have suffered. Your Honor, what was the sentence given was at the lower end of the guidelines range. What was the upper range of the guidelines range? I believe it was a 210 to 262-month range, and he was given a 210-month sentence. Do you think that, you know, even though there's a within-guidelines sentence that the law would allow for a decision to be made by a lowly district court judge, that I still consider this to be substantively unreasonable even if it's a guideline sentence? Yes, Your Honor. I think the judge is not constrained by the guidelines upward or downward. I think this judge could have in his discretion under 3553 said, I believe a 210-month sentence low-end guideline was greater than necessary under 3553, but this judge did an exquisite job of going through the guidelines. The 3553A factors in coming to a sentence that in his discretion after having sat through the entire trial and then sat through the post-trial proceedings and having seen this man prove to obstruct justice. Do you recommend a specific sentence or did you just say a guideline sentence would be appropriate? We recommended the low end of the range, Your Honor. We did. The one other fact I would certainly point out to Your Honors that justifies this sentence is in addition to committing perjury and obstructing justice at trial, this defendant also attempted to influence jury deliberations in this case by having a lawyer publish a letter that basically threatened the residents of Idaho with losing over $500 million in an economic stimulus if he wasn't essentially acquitted of this offense. And that letter was fortunately never published in the newspaper, but that was certainly the intent and we have the email, which is, I believe, attachment H in the record to the PSR wherein he exhorts this attorney to get this letter publicized in the newspaper. And it's these facts, Your Honors, in addition to the loss that was created and the vulnerable victims that suffered as a result of this, but this man simply did not learn and has not learned and the judge's sentence under 3553 was justified. Unless the court has any other questions, I will complete my argument. Hearing no questions, I think you may conclude. Thank you, Your Honors. And now. I have 56 seconds. I'd just like to address. We're going to give you two minutes. Oh, thank you. Thank you. Two minutes. Thank you. With respect to sentencing and what the government has characterized as aggravating factors, those are aggravating factors if they're evidence of criminality. But, again, Mr. Hutchison believed in himself, perhaps was overconfident. So I think it would be okay to consider his national reputation and the fact that he testified before Congress. And if he was intentionally using those things to induce new investment into his retirement funds or the letter that was attempted to be published. However, it's abundantly clear that Mr. Hutchison believed in himself. He believed that he was valuable to the State of Idaho. And so he would have believed the contents of that letter. It necessarily wasn't, there wasn't a criminality to that, that he was attempting to improperly influence anyone. He was, from his point of view, trying to get out the truth or publicize the truth about what was happening in his case, that he was. All right. So what Ninth Circuit case would you, do you rely on to say that a sentence at the low end of the guidelines range is substantively unreasonable? I don't know that there is one that I can cite for that precise point, Your Honor. But I do stand by the argument. And I think, ultimately, at the end of the day, it's kind of just taking a look at that number, 17 years, for a gentleman that did have, was esteemed in his field and has, because of his own actions, his reputation is destroyed. His life is destroyed. So already there's enormous consequence. I think we understand your argument. And you're over your extra time. Thank you. Thank you both. Excellent argument. And the Boise lawyers are as excellent as the Spokane lawyers. So thank you both for coming here. And good luck on your travels back.
judges: Block, Gould, Christen